UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIEL SHEPPARD,

Plaintiff,

-vs-                                                    Case No.  8:04-cv-1560-T-24TBM

PRISON  HEALTH  SERVICES,   Sheriff
HOMER  C.  HENDERSON  (formerly  CAL
HENDERSON), and DR. JOHN MUBANG,

Defendants.

_____

# O R D E R

This cause is before the Court on Plaintiff Daniel Sheppard's 42 U.S.C. § 1983

complaint alleging that Prison Health Services (PHS),[1] subjected Sheppard to cruel and

unusual punishment by demonstrating deliberate indifference to Sheppard's serious

medical needs during two periods in which Sheppard was incarcerated in the Hillsborough

County Jail system (HCJ).  Sheppard's first period of incarceration was from August 29,

2003 until September 12, 2003;  his second was from March 24, 2004 until April 16, 2004.

PHS is a corporation[2] contracted by the Hillsborough County Sheriff's Office to  provide

medical and nursing care to inmates at HCJ during the relevant time periods.  Sheppard

_____

[1] The parties filed a "Joint Stipulation of Plaintiff's Voluntary Dropping of Defendant, John Mubang,
M.D. as a Defendant Without Prejudice" on June 13, 2005.  Sheppard filed a "Second Amended Joint
Stipulation of Plaintiff's Voluntary Dropping of Defendant, Homer C. Henderson, a/k/a Cal Henderson, in his
Capacity as Hillsborough County Sheriff as a Defendant with Prejudice" on October 11, 2005.  The Defendants
were terminated on December 7, 2005. (Doc. No. 96).

[2] PHS is incorporated under the laws of the State of Maryland and has its principal place of business
in the State of Tennessee.

seeks compensatory and punitive damages and declaratory and injunctive relief. (Complaint, p. 2)

PHS has filed a motion for summary judgment and Sheppard has filed a memorandum in opposition to the motion for summary judgment.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). The evidence is viewed in the light most favorable to the opposing party. *Miller v. King*, 384 F.3d 1248, 1258-59 (11th Cir. 2004); Barfield *v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

The Court does not decide issues of material fact, but determines whether such issues exist to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id. at 248.* Applicable substantive law will identify those facts that are material. *Id.*

## APPLICABLE SUBSTANTIVE LAW

It is well-settled that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, "[m]edical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' Mere incidents of negligence or malpractice do not rise to the level of

-2-

constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (internal citations omitted).  "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment." *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir.1994).  Moreover, when an inmate receives adequate medical care, but desires "different modes of treatment, the care the jail provided [does] not amount to deliberate indifference." *Hamm*, 774 F.2d at 1575.

The Eleventh Circuit has explained that the "deliberate indifference" standard has an objective and a subjective component. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d at 1186, and that both components of deliberate indifference must be met for a plaintiff's claim to succeed.

The objective component of deliberate indifference concerns the "seriousness" of the injury or deprivation of which a plaintiff suffered. *Hamm*, 774 F.2d at 1574 ("[W]ith reference to medical needs, [prison officials] must not be deliberately indifferent to detainees' serious medical needs."). The Supreme Court has held that deliberate indifference to medical needs "amounts to an Eighth Amendment violation only if those needs are 'serious.' " *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The subjective component of deliberate indifference concerns the state of mind of the defendant whose acts or omissions are alleged to be the basis of the plaintiff's claim. *Hill*, 40 F.3d at 1186. The Eleventh Circuit has "consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate

indifference." *Id.* at 1186 (internal marks and citation omitted). The state of mind required is thus greater than mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

"No static 'test' can exist by which courts define cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)). "The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.' " *Hudson*, 503 U.S. 1, 8 (1992) (quoting *Estelle*, 429 U.S. at 103).

In *Wilson v. Seiter*, 501 U.S. 294, 304 (1991), the Court held that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  Therefore, a prisoner advancing such a claim must, at a minimum, allege "deliberate indifference" to his "serious" medical needs. *See Estelle,* 429 U.S. at 106.  "It is <u>only</u> such indifference" that can violate the Eighth Amendment, *ibid.* (emphasis added); allegations of "inadvertent failure to provide adequate medical care," *id.*, at 105,  or of a "negligent . . . diagnos[is]," *id.*, at 106, fail to establish the requisite culpable state of mind. A court considering a prisoner's Eighth Amendment medical claim must determine whether "'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*,  503 U.S. at 8-9.

To constitute cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, Defendant's conduct must involve more than ordinary lack of due care for the prisoner's interests or safety; it is obduracy and wantonness, not inadvertence or error in good faith, that characterize conduct prohibited by Eighth Amendment, whether that

conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. *Whitley v. Albers*, 475 U.S. 312,  319 (1986).

To state an Eighth Amendment violation for inadequate medical care under *Estelle v. Gamble, supra*, it must be shown that the medical treatment was "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness or where the medical care is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).

While the conditions under which a convicted prisoner is held are subject to scrutiny under the Eighth Amendment, the conditions under which a pretrial detainee is confined are scrutinized under the Due Process Clauses of the Fifth and Fourteenth Amendments. *Bell v. Wolfish*, 441 U.S. 520,  535 & n. 16 (1979) (utilizing Fifth Amendment Due Process Clause); *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir.1985) (utilizing Fourteenth Amendment Due Process Clause), *cert. denied,* 475 U.S. 1096 (1986).

In sum, Sheppard must prove deliberate and intentional conduct on the part of an employee or agent of PHS resulting in a deprivation of his constitutional rights. First, Sheppard must show 1) that PHS intentionally committed acts that violated Sheppard's constitutional right to be free of deliberate indifference to a serious medical need;  2) that in so doing, PHS acted "under color" of the authority of state law; 3) that the acts of PHS were the proximate or legal cause of Sheppard's damages; and, 4) that PHS had a policy of custom of being deliberately indifferent to inmates' serious medical needs.

To establish a policy or custom, Sheppard must show a persistent and widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well-settled as to constitute a custom or usage with the force of law." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991); *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir.1994). Thus, PHS is entitled to summary judgment if Sheppard cannot establish the existence of a policy or custom that was the moving force behind a constitutional violation--even assuming that Sheppard can show that prison officials were "deliberately indifferent" to his serious medical need.

<u>PLAINTIFF'S ALLEGATIONS IN THE COMPLAINT</u>

Sheppard contends that while he was incarcerated in the HCJ from August 29, 2003, to September 12, 2003, and from March 24, 2004, until April 16, 2004, he suffered from diabetes mellitus and osteomyelitis, a serious bone infection.  He alleges that in August 2003, he was suffering from open wounds to his back and right foot and was receiving intravenous antibiotics through a peripherally inserted central catheter, commonly referred to as a PICC line.  He alleges that jail medical personnel removed the PICC line and ceased administration of IV antibiotics, displaying a reckless disregard for his health and safety.

He further alleges that from August 29, 2003, until September 12, 2003, jail medical personnel displayed deliberate indifference to his worsening foot wound. He contends that nurses simply recorded the wound's appearance and deterioration, noting that the wound was draining large amounts of serosanguinous fluid, that it appeared to be gangrenous, and that the wound looked necrotic.  He alleges that, despite these recorded observations,

Sheppard was not treated, was not sent to a specialist or a hospital for evaluation and was ignored.

He contends that on September 14, 2003, after his release from the custody of the Hillsborough County Sheriff (on September 12, 2003), Sheppard presented to the Emergency Room at University Community Hospital (UCH).  He alleges that his back wound had deteriorated; he had a necrotic wound to his right foot, and was infected with osteomyelitis.  He alleges that his white blood count was 23,000 and he was diagnosed with bacterial endocarditis.

Then, in March and April 2004, while Sheppard was again incarcerated in the HCJ, he was suffering from the same chronic osteomyelitis and that during his incarceration, his foot wound was again ignored and again worsened.   He claims that the jail medical staff knew that the presence of a diabetic ulcer and osteomyelitis placed him at increased risk for loss of his extremity and that they also knew Sheppard required immediate attention from a wound care specialist and an infectious disease specialist.  He alleges that, despite such knowledge, and because of the financial incentives intentionally placed in the PHS contract, Sheppard was not referred to a specialist and was not treated in accordance with the most basic medical principles.

He claims that during this [second] confinement, one of PHS's staff physicians did an incision and drainage of the osteomyelitis-infected wound and that the procedure was done "in an utterly unacceptable manner, without consideration of the vulnerable nature of the tissue involved and the likelihood of spreading infection, and the infection and wound worsened."   He alleges that as a result of this recklessness, neglect, and deliberate

indifference, Sheppard required another hospital stay at Tampa General Hospital (TGH),

during which time he underwent amputations of his right second and third toes.

Sheppard alleges that as a direct and proximate result of the foregoing acts of

deliberate indifference, he suffered bodily injury and resulting pain and suffering, mental

anguish, loss of earnings and loss of earning capacity, medical and nursing expenses, loss

of capacity for the enjoyment of life, disfigurement, disability, and aggravation of a

preexisting condition.  He contends that the damages are either permanent or continuing,

and that he will suffer such losses and damages in the future. He contends that PHS

continues to provide substandard medical care to inmates at the HCJ facilities.

PRISON HEALTH SERVICES' ALLEGATIONS<br>IN THE MOTION FOR SUMMARY JUDGMENT

Sheppard was born July 22, 1960 in Chicago, Illinois, and eventually moved to

Tampa, Florida in 1983.  Sheppard's earliest medical records available in this action are

outpatient records from Dr. Cromer (1999-2002) (Doc. No. 97) and the Northwest Family

Health Center (2003 and 2004) (Doc. No. 98).  These records show  an initial diagnosis of

diabetes mellitus in 2000; a consistent history of diabetes; and several difficult to manage

skin infections related to lack of control of the diabetes.

Prior to Sheppard's incarceration periods in HCJ, Sheppard was suffering from

uncontrolled diabetes mellitus, an infected wound in his left scapular area (carbuncle) and

an infected wound on his right foot, along with multiple other medical complications. On

April 7, 2003, Sheppard underwent an amputation of his right great toe due to

osteomyelitis.[3] (See pages 5-0027 and 28 of the UCH records, attached to Doc. No. 74 as Exhibit A.)

On or about August 6, 2003, Sheppard was admitted to UCH and had surgical removal of a large carbuncle[4] of the upper back with deep-seated abscess and a large area of cellulitis.[5] During this hospitalization, a PICC[6] line was inserted for administration of intravenous antibiotic treatment. (See pages 5-00131 and 121-122 of Exhibit A.)

Upon his discharge from UCH on August 12, 2003, Sheppard had an infection involving methicillin-resistant staphylococcus aureus (MRSA). His discharge instructions were to receive IV Vancomycin[7] thereafter twice a day for approximately seven weeks at an infusion center. (See pages 121-122 of Exhibit A.) Plaintiff admits the PICC line he received was for administration of IV antibiotics following his hospital discharge. (See paragraphs four (4) through (6), nine (9) and ten (10) of Defendant's Request for Admissions and Plaintiff's Response thereto, attached to Doc. No. 74 as Composite Exhibit F.)

Sheppard failed to comply with these hospital discharge instructions.  Sheppard testified, in his deposition, that he did present for and receive the prescribed IV antibiotic therapy or "most of it;" however, he cannot provide a location or any records to support his

---

[3] Osteomyelitis is an infection of the bone, especially the marrow.

[4] A carbuncle is an inflammation of the skin and deeper tissues, typically caused by bacteria.

[5] Cellulitis is an inflammation/infection of cellular or connective tissue.

[6] A PICC line is a peripherally inserted central catheter.

[7] Vancomycin is an antibiotic.

claim. (See pages 23 (lines 18-25), 24-25, 31 (lines 15-25), 32 (lines 1-9) of Sheppard's deposition transcript, attached to Doc. No. 74 as  Exhibit C.)

Further, Sheppard's deposition testimony contradicts that he ever received treatment as he was "about to start" it when he was arrested. (See pages 31 (lines15-25), 37 (14-25), 38 (1-17), 40 (7-19 and 25), 41-42 of Exhibit C.) He admits Dr. Perrone at TGH told him if he had started treatment [after his discharge on August 12th], the injury probably would never have happened. (See page 46 (lines 10-24) of Exhibit C.)

Upon arrest, Sheppard presented at HCJ on August 29, 2003, with the long-standing or continuing existing wounds and injuries described above. During his incarceration, Sheppard failed to communicate the nature of his infection (MRSA) to infirmary representatives. (See pages 1-00013, 17, 24 and 27 of his infirmary records, attached to Doc. No. 74 as Exhibit B.)   His PICC line, inserted by UCH during his hospital stay between August 6, 2003 and August 12, 2003 and before his incarceration on August 29, 2003, was appropriately[8] removed due to infection, and antibiotics were administered. (See pages 21-23 and 27 of Exhibit B.)   Sheppard's vital signs were taken routinely and remained essentially normal. (See pages 1-00015 and 33-35 of Exhibit B; see Affidavit and report of D. Stewart MacIntyre, M.D., infectious disease expert, attached as Exhibit G. to Doc. No. 74)

Sheppard had a history of non-compliance with his care, per his treating physician, Dr. Heidi Stephens (See pages 10 (lines 19-22), 11 (5-7, 14-17), 12 (22-24), 13 (1-5 and

---

[8] PHS's experts stated in their affidavits that the infected line was appropriately removed, according to HCJ medical records.

20-25), 14 (1-6, 17-19), 15 (1-3), 17 (1-10), 18 (1-18), 19 (2-4), 20 (8-11), 27 (20-25), 28 (1-14) of deposition of Heidi Stephens, M.D., attached as Exhibit J. to Doc. No. 74).  Even after release from HCJ on September 12, 2003, he failed to seek the IV treatment he knew he needed. (See medical records from Dr. Ronald Barbour, attached to Doc. No. 74 as Exhibit D; see page 182 of Exhibit A.)  He waited several weeks before follow-up with his own treating physician. (See page 53 (lines13-25) of Exhibit C.)

Furthermore, in 2004, Sheppard failed to comply with medical directions involving antibiotics. (See pages of Sheppard's records from TGH, attached to Doc. No. 74 as Exhibit E.)

PHS contends that "no records or evidence exist to show Sheppard ever received the necessary IV treatment prescribed between August 12, 2003 - when he was discharged from UCH - and August 29, 2003 when he was arrested. Sheppard concedes he cannot produce documents substantiating his denial that he failed to seek the necessary IV treatment. (See paragraph one (1) of Defendant's Request to Produce incorporated in its Request for Admissions and Sheppard's Response thereto, attached as Exhibit F to Doc. No. 74.)

Because of this absence of documentation, Sheppard cannot establish that the necessary medical care was ever obtained.  This critical lack of medical compliance caused the injuries and damages of which Sheppard claims and experts in this case so assumed in rendering opinions relative to Sheppard's clinical condition, necessary treatment to avoid deterioration, and his prognosis. (See attached reports and affidavits of experts: Dr.

MacIntyre (Exhibit G), Dr. Nitzkin (Exhibit H) and Dr. Shames, Exhibit (I); the exhibits are attached to Doc. No. 74.)[9]

Further complicating Sheppard's medical conditions were his uncontrolled diabetes and his illicit drug use. (See pages 16-17, 102, 124, 146, 181 and 233 of Exhibit A.) Sheppard represented to HCJ that his last treatment for diabetes at the time of his August 2003 incarceration was in 1999. (See page 23 of Exhibit B.)

At a minimum this Court may accept Sheppard's deposition testimony that he used crack cocaine only a few times, the last time being in August 2003. (See pages 84 (lines 14-15) and 85 (1-6) of Exhibit C.) However, Sheppard admits to drug use between September 12 and 14, 2003. (See paragraph 15 of Exhibit F.)

Although specific antibiotics to address MRSA were administered on or about September 1, 2003, approximately three days after he was taken to HCJ, the antibiotics given within twelve hours of incarceration by the jail staff were sufficient to maintain a balance for Sheppard so that the MRSA did not become worse. (See pages 15, 17, 21-22 and 30-31 of Exhibit B; Exhibits G and I attached to Doc. No. 74.)

Sheppard eventually developed bacteremia and endocarditis, septic embolic and diskitis due to his infected PICC line, failure to follow up with his IV therapy after his release from UCH and before his incarceration on August 29, 2003, and failure to comply with medical treatment instructions. (See Exhibits G and I.)  The removal of his two additional

---

[9] The reports of all experts, i.e., Drs. MacIntyre, Nitzkin and Shames, were provided to Plaintiff's counsel. No depositions of these experts were taken.

toes was due to his adamant request, despite his doctor's recommendation otherwise at the time. (See pages 36 (lines 20-25) and 37 (lines 1-8) of Exhibit J.)

Sheppard alleges that, as a result of Defendant's recklessness, neglect, and deliberate indifference, his medical condition deteriorated to the point that he required amputation of the second and third toes on his right foot. However, his treating physician, Heidi Stephens, M.D., indicated that once a toe is amputated, further amputations are unavoidable because the natural balance of the foot has been altered. (See page 29 (lines12-20) of Dr. Stephens' deposition attached as Exhibit J to Doc. No. 74).

Sheppard's claims that PHS acted with deliberate indifference to his serious medical needs, demonstrated reckless disregard that resulted in a worsening of his conditions, and had "a long history of systematic and deliberate indifference to the serious medical needs of pretrial detainees, inmates and prisoners…." that "resulted in Sheppard's being subjected to cruel and unusual punishment in violation of the protections guaranteed" in the Eighth and Fourteenth Amendments of the U.S. Constitution are not supported by a scintilla of evidence in the record.

<u>PLAINTIFF SHEPPARD'S RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT</u>

Sheppard alleges that on his arrival at HCJ [in August 2003], PHS medical personnel noted that he was a diabetic; that he had a red swollen area on top of his foot; and an infected-looking wound on his upper back. (Defendant's Exhibit 2, PHS records, admission note dated August 29, 2003). Sheppard also had a PICC line still in place, and the PHS nurse was aware of its presence. The nurse noted that the PICC line looked infected. Sheppard told the PHS nurses that he had been diagnosed with an infection attributable

to an organism known as methicillin resistant staphylococcus aureus, and abbreviated MRSA. Sheppard also informed medical personnel that he had been a patient at UCH; that the PICC line was inserted while he was there; and that he was to receive Vancomycin to treat the infection. (Defendant's Exhibit 1, February 17, 2005 Deposition of Daniel Sheppard, (page 37, line 166-page 38, line 3))

Sheppard was seen by Linda Gilbert ARNP on August 29, 2003.  Nurse Gilbert noted that Sheppard had "just been" in the hospital for his back infection.  She assessed him and noted that he had diabetes, an open back wound, an infected PICC line, and cellulitis of the right foot. (Defendant's Exhibit 3, HCJ records, Note of Line Gilbert, ARNP).

Other than Sheppard's deposition testimony that he informed PHS staff of his MRSA infection, there is nothing in the record to suggest that anyone contacted UCH to determine why Sheppard had a PICC line, what drugs Sheppard was receiving, or what organism was involved.  Dr. Roderick Gottula, who is identified as "an expert in correctional health care, having lectured and published on the subject many times" stated in his affidavit that failure to contact UCH rose to the level of deliberate indifference to Sheppard's serious medical needs.  (Defendant's Exhibit 5, Affidavit of Dr. Roderick Gottula)

Sheppard also contends that PHS's failure to contact anyone at UCH to obtain information about Sheppard's prior treatment and condition violated its own policy number G024 regarding continuity of care which provides, in pertinent part:

> Every effort will be made to obtain health information and records from previous health care providers, with consent of the patient, when the patient has a medical problem that has been treated prior to incarceration.

(Defendant's Exhibit 6; date of origin: 12/01/02; revised: 9/29/03)[10]

According to Sheppard's deposition testimony, "no one" at the jail paid serious attention to his foot and eventually the abscess burst. (Defendant's Exhibit 1, Deposition of Daniel Sheppard, (page 38 line 8-page 39, line 20)).   Dr. Gottula testified in his videotaped deposition:

> Well, I think -- my opinion is that the care provided by Prison Health Services when Mr. Sheppard was incarcerated were so substandard that they are deliberately indifferent, that the type of care that he was provided was outside of the scope of practice of the individuals who were at Prison Health Services.  and they no only didn't treat his problem appropriately, but also did not seek backup consultation nor any information regarding his prior medical care to assist them in properly treating Mr. Sheppard.

(Exhibit 7, (page 11, line 22-page 12, line 5)).

Sheppard was released from HCJ on September 12, 2003, with a known active infection, but without any antibiotics. (Records of PHS, Exhibit 8).  Discharging Sheppard without antibiotics when he was suffering from a known, serious infection is tantamount to a complete refusal to provide care, and is the type of omission that even a layman would recognize as inappropriate.  This is deliberate indifference to Sheppard's serious medical needs. (Affidavit of Dr. Gottula).  It is also counter to PHS policy/procedure number G032 (Exhibit 9).

On September 14, 2003, upon his release from the custody of the Hillsborough County Sheriff, Sheppard presented to the Emergency Room at UCH.  His back wound had deteriorated, he had a necrotic wound to his right foot and was infected with osteomyelitis;

---

[10] Defendant did not provide a copy of the policy that was in effect during Sheppard's first incarceration.

his white blood count was 23,000; he had bacteremia, and he was diagnosed with bacterial

endocarditis, a serious infections of the lining and valves of the hears. (Exhibit 10,

Discharge Summary from UCH Carrollwood).  Dr. Gottula states in his affidavit:

> During this hospitalization [at UCH] it was discovered, that he [Sheppard] not only had MRSA of his foot, but that this condition had resulted in a spread of the bacterial infection to his heart valves, lungs and spine. This type of condition could not have begun in just two days after his discharge from the jail. I believe that it had already started while he was incarcerated and was allowed to become worse by his lack of treatment with appropriate antibiotics.
>
> An infection such as this can be life threatening.  I believe it was due to the substandard care provided by PHS staff while he was incarcerated at the Hillsborough County Jail.  It is my opinion that this care exhibited deliberate indifference to Mr. Sheppard's serious medical needs.

(Plaintiff's Exhibit 5)

Sheppard suffered from a pattern of grossly inadequate care at the hands of PHS.

In March and April 2004, Sheppard returned to HCJ.  Even when PHS had records

indicating a chronic infection it ignored a toe infection for at least ten days.  PHS again

failed to even attempt to contact the intervening health care providers, again in violation of

its own policy. In Dr. Gottula's opinion this situation led to the need for the amputation of

Sheppard's right second and third toes.

Sheppard also contends, based on Dr. Stephens' deposition, that the cause and

origin of his foot problem was not addressed.  (Exhibit 12, page 32, line 5-page 34, line 8).

According to the records, the draining of the pus occurred 15 days before Sheppard's

release in April 2004.  The cause and origin of the pus -- a diabetic ulcer -- was "completely

unaddressed" during that time.

DISCUSSION

Sheppard has shown that PHS was acting under color of state law.  However, Sheppard has not shown that PHS was deliberately indifferent to his serious medical needs; that PHS was the proximate or legal cause of his damages; or that PHS had a custom or policy of exhibiting deliberate indifference to inmates' serious medical needs in the HCJ.  The record, taken as a whole, could not lead a rational trier of fact for find for him, the non-moving party, and there is no genuine issue for trial.  Therefore, for the reasons below, Defendant PHS's motion for summary judgment **WILL BE GRANTED.**

When Sheppard was discharged from UCH on August 12, 2003, he had an infection involving methicillin-resistant staphylococcus aureau (MRSA).  His discharge instructions were to receive IV Vancomycin, an antibiotic, twice a day for approximately seven weeks at an infusion center.  He did not begin the treatment.

When he was arrested on August 29, 2003, Sheppard suffered with the above-described wounds or injuries that were long standing and/or continuing.  During his medical screening at booking, the medical staff determined that he should be sent to the infirmary at Faulkenburg Road Jail, and he was immediately transported there where he was placed in isolation and administered oral antibiotics.  (Sheppard 's deposition, page 37, lines 16-22).

Due to an infection at the site of insertion point, the infirmary  medical staff removed the PICC line that had been inserted by UCH prior to Sheppard's incarceration on August 29, 2003. (See pages 21-23 and 27 of the Infirmary records).  During his incarceration, Sheppard's vital signs were taken routinely and remained essentially normal. (See pages

-17-

1-00015 and 33-35 of the Infirmary medical records).  He was treated for an infection in his foot, also.

During the period between his two jail bookings, Sheppard was in and out of two hospitals, UCH and Tampa General Hospital (TGH) and remained in a nursing home for five weeks to assure continuation of antibiotic therapy for at least those five weeks.  When Sheppard was rebooked into HCJ in March 2004, his history of diabetes and osteomyelitis due to MRSA was noted.  There appeared to be no physical evidence of active infection at that time.

Sheppard was a diabetic unwilling or unable to follow prescribed regiments of care, even when he knew that major medical complications could be the result of failing to do so. Both times Sheppard was booked into the jail, he appeared to be reasonably healthy, afebrile, and in reasonably good physical condition except for the diabetes, the sores noted on his back and foot, and the infected PICC line.  At his first incarceration,  the jail medical staff immediately initiated antibiotic therapy to better stabilize his condition.  Sheppard did not inform PHS staff that he was under treatment for MRSA with intravenous Vancomycin.[11] PHS saw Sheppard one to three times each day during the entire period of his incarceration and altered antibiotic therapy when it became clear that the initial therapy was ineffective.  The initial care provided by PHS was ineffective for the osteomyelitis, but did not constitute deliberate indifference to Sheppard's medical needs.  The care PHS provided stabilized his condition until he could be treated at a more sophisticated medical facility.

_____

[11] Sheppard informed PHS that he had been hospitalized with an infection at UCH.  (See PHS's Exhibit B page 1 00013 Facility Records).

His re-hospitalization shortly after release from HCJ in September 2003 had more to do with his non-compliance with UCH's prescribed post-discharge course of Vancomycin therapy and Sheppard's failure to provide an adequate history to the PHS staff than any deficiency in care provided by PHS.

During his 2004 incarceration, PHS reinitiated intravenous antibiotic therapy when physical signs indicated a problem with his osteomyelitis.  PHS provided medical care to the best of its ability, given the limitations of the medical history provided by Sheppard. Sheppard was non-compliant with recommended outpatient therapies for his osteomyelitis. Based on the natural progression of localized osteomyelitis, Sheppard's  suggestion that the subsequent amputation of two toes could have been avoided by more aggressive therapy in HCJ is speculation.  Based on his medical history, the fact that he eventually suffered from amputation of the second and third toes on his right foot does not rise to a level which could be considered deliberate indifference by PHS.

The facts of this case further demonstrate that the loss of Sheppard's toes was due to his longstanding failure to comply with treatment for diabetes. (See Exhibit J, the deposition of Heidi Stephens, M.D., Sheppard's treating physician; see also Exhibit F: Sheppard's responses to Requests for Admissions and Request for Production Relating to Request for Admissions.)

Sheppard has not alleged sufficient facts to rise to the level of deliberate indifference. Sheppard was medically evaluated and a treatment plan was implemented based upon that evaluation. "Negligent treatment or medical malpractice, or a claim based on differences of opinion over matters of medical judgment, are insufficient to state an

Eighth Amendment claim." *Veloz v. State of New York*, 339 F. Supp. 2d 505, 521 (S.D. N.Y. 2004). Sheppard's allegations related to "inadequate medical care" essentially constitute a difference of opinion between him and the medical providers within the jail system. He admits that he received treatment; however, he complains that he wanted or should have received different treatment. (See deposition of Daniel Sheppard, February 17, 2005, pgs. 31-34) "While prisoners have a right to medical care, they do not have a right to choose a specific type of treatment…The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to a disagreement over the appropriateness of a particular prescription plan." *Veloz v. State of New York*, 339 F. Supp. 2d at 525.

Viewing the evidence in the light most favorable to Sheppard, Sheppard's claim amounts to medical negligence, not deliberate indifference.     "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. …In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference has subjective and objective components. Objectively, the court determines whether the deprivation was sufficiently serious. Subjectively, the court looks at whether the prison official acted with a sufficiently culpable state of mind (which equates to awareness of a substantial risk of harm.)   *Farmer v. Brennan*, 511 U.S. 825 (1994); and see *Hill v. DeKalb County*, 40 F. 3d 1176 (11th Cir.

1994) To rise to the level of deliberate indifference, the Defendant must "purposefully ignore or fail to respond to a prisoner's pain or medical need …" *Engelleiter v. Brevard County*, 290 F. Supp 2d 1300, at 1307 (2003).

The record in the present case contains no evidence of an unconstitutional custom or policy causing Sheppard's alleged injuries and no evidence of deliberate indifference in the provision of his medical care.

Accordingly, the Court orders:

That Defendant Prison Health Services' motion for summary judgment (Doc. No. 74) is granted.  The Clerk is directed to enter judgment for Prison Health Services and to close this case.

ORDERED at Tampa, Florida, on January 4, 2006.

SUSAN C. BUCKLEW
United States District Judge

Counsel of Record